## Case No. 521.

### The ARGUS.

### [Olc. 304.][1]

District Court, S. D. New York.    April, 1846.

COLLISION—BETWEEN SAILING VESSELS—TACKING —CUSTOMS ON NORTH RIVER.

1. The estimate or judgment of witnesses formed in the night time, and expressed orally, or exhibited on charts or diagrams on a vessel in motion, are of slight weight in determining the relative position and bearing of another vessel, also under motion.

[See The Narragansett, Case No. 10,019.]

2. A vessel close-hauled on the wind has a right to rely to the last moment on the ability and care of another meeting her with the wind free to avoid a collision, and is not responsible for a wrong movement on her part, caused by the negligence of the one running free; but a vessel close-hauled is bound to hold her tack, so as not to come round in the way of one free and endeavoring to avoid her.

[Cited in The Greenpoint, 31 Fed. 232.]
[See The Catherine v. Dickinson, 17 How. (58 U. S.) 170; The Clara M. Porter, Case No. 2,792; The Clement, Id. 2,879; The John Stuart, Id. 7,427; The M. M. Hamilton, Id. 9,685.]

3. A vessel running free has no right to cross the bows of a beating vessel, unless she has clearly room to do it without disturbing her course; nor to come so closely upon the stern of the other as to create apprehensions of a collision, and alarm her into a change of her course to escape it.

[Cited in The Free State, Case No. 5,090; The Maria & Elizabeth, 7 Fed. 255; The Renovator, 30 Fed. 195.]
[See The Rebecca, Case No. 11,618; Allen v. Mackay, Id. 228; The Blossom, Id. 1,564.]

4. A vessel on the wind has the right to run out her tack, and it is the duty of another vessel approaching her before the wind to take the necessary precautions to avoid a collision.

5. The customs as to the navigation of the North river are in consonance with nautical usages at sea, and the rules regulating such navigation are the same as obtain in regard to sea-going vessels.

[See Newton v. Stebbins, 10 How. (51 U. S.) 586; The Santa Claus, Case No. 12,327.]

In admiralty.

Geo. A. Shufeldt, for libellants.

A. L. Jordan, for claimant.

BETTS, District Judge. This is a case of collision between two sloops on the North river, and the extent of damage incurred renders it one of serious importance to the respective parties. It has been litigated at great expense, and through protracted and

tedious inquires into the facts. The law and facts bearing upon the case have been thoroughly discussed; orally before the court, and by able and well-digested written arguments submitted by the counsel. The statements of the transaction by the witnesses do not strictly coincide with the representations of the parties in their pleadings, but the variances are, perhaps, deserving no special regard, other than in respect to the effect they may have upon the credit of some of the witnesses, whose testimony is called in question. The libellants charge that the sloop Bucktail, owned by them, being on a voyage down the river to the city of New York, and about opposite the end of the long dock at Rhinebeck, and nearly in the middle of the river, making a tack to the westward, the wind ahead, blowing straight up the river, the sloop Argus was seen coming in the opposite direction before the wind, and standing directly for the Bucktail; and as soon as within call, she was hailed by the Bucktail to bear up or to luff; that no attention was paid to the direction; on the contrary, she continued her course, heading for the Bucktail, until her stem struck the larboard bow of the Bucktail, cutting it down to the water's edge, from which injury she afterwards sunk and was totally lost.

The claimant answers, that the night was very dark, and the atmosphere thick and hazy, so that objects could be distinguished but a short distance; that the wind was blowing heavily from the southeast; the Argus was on her course up the river, from New-York to Hudson, bearing about northeast; when she was opposite the long dock at Rhinebeck, and near the west shore of the river, the Bucktail was discerned from her a very short distance ahead, obliquely to the eastward, beating down the river, on a tack from the eastern to the western bank of the river, with the wind so favorable as to be able to hold her course nearly with that of the river. That it was judged advisable to keep the Argus away to avoid a collision, and she was steered in a proper angle towards the westerly bank of the river, so that she could have safely passed the Bucktail on her lee side without danger of collision, if that vessel had kept her course as she was bound to do; but that after the direction of the Argus had been so altered, the Bucktail deviated from her proper course, and ran directly across the bows of the Argus, thus producing the collision complained of. The other parts of the pleadings need not now be rehearsed, as the gist of the controversy is involved in these allegations. Before adverting to the proofs adduced by the parties, it is proper to observe, that the estimate or judgment of witnesses, as to the bearings, distances or relative positions of objects on the water looked at in the night-time, and particularly when the witnesses are placed on vessels in motion, cannot be considered entitled to confidence as facts. They are

[1][Reported by Edward R. Olcott, Esq.]

little more than conjectures, formed in a state of mind and position disabling the witnesses from speaking with any reliable certainty:

The course of the river, at the place of the casualty, is assumed by the witnesses to be north and south, and the direction of the wind, and the track of the two vessels, are probably estimated with reference to that assumption; and as the true range of the river is a point or more east from the one supposed, the relations of the other particulars would have to be taken with corresponding allowances. Indeed, both the proofs and the arguments concede, that a variance of several points from any of the supposed courses might be reasonably expected and accounted for, without impeaching the veracity or intelligence of the witnesses. These considerations must lead to great caution in adopting diagrams or charts framed upon the courses assigned the two vessels by the respective witnesses, as affording any just criterion by which the facts in controversy may be adjusted. A few prominent particulars in the case, not essentially in dispute, appear to me to settle the question between the parties as to the wrong or negligence of the claimants' vessel, and the right of the libellants to damages. The Bucktail was sailing against the wind, be its exact direction at whatever point may be assumed, and her longest stretch or tack was from the east to the west. She was loaded below, and had bundles of hay on deck so piled up as to require the boom to be raised by a reef in the mainsail, and this trim would somewhat impede and embarrass her management. It was night, but not dark enough to prevent the two vessels being seen by persons on each, at a distance of half a mile to a mile apart. The Argus was light, and running free before the wind, about in the middle of the river, which, at the place in question, was a mile wide, with the channel from shore to shore. The Bucktail came around on her larboard tack a quarter of a mile above the long dock at Rhinebeck, and was supposed by her pilot to range off about a south southwest course, and by those observing her from the Argus, to head southwest. The defence is placed essentially upon the position that she was able on that wind to hold her course, which, if adhered to, would have carried her far east of the track the Argus was running; and, also, on the proposition of law, that the Bucktail was bound to pursue the course she had taken, whilst the Argus was only required to use measures for avoiding her, on her continuing to hold that course as close to the wind as she could be laid until her tack was run out.

The counsel for the claimant submits various diagrams to substantiate the conclusions he draws from these considerations. Whatever nautical theories may be raised in respect to the relative bearing, ability and duty of

the two vessels, I am satisfied, upon the proofs, that up to the point of time at which a collision became apparent and imminent on board both vessels, the Bucktail was managed by her crew with ordinary skill and precaution. There is nothing in the evidence necessarily conflicting with the statements of those on board the Bucktail, that she was kept steadily on her course as near to the wind as her build and trim would permit. She took her direction towards Kingston Point, intending to run out her tack in that vicinity; and upon the evidence, this would bring her scarcely half a mile below a right line across the river from the place of her departure on the tack. The actual course she was making across the water could not correspond with any of the hypotheses of the witnesses on either side, for though it was undoubtedly, by the compass, south of west, yet the notions that it was southwest or south southwest, were only conjectures, and of slight moment in the case, it being satisfactorily proved that she was kept closehauled to the wind, with a view to Kingston Point on the west shore as the terminus of her tack.

The libellants' witnesses testified in consonance with the libel, that the collision took place near the middle of the river, opposite Rhinebeck dock, which, as appears from the surveys, was about eighty rods below the beginning of her tack. The Bucktail would accordingly have made southing a quarter of a mile, and reached nearly half the distance across the river towards Kingston Point. The witnesses for the claimant concur substantially in placing the two vessels near the middle of the river when they met, and there can be no question, upon the evidence and the plan of the various courses, that if she had made, from the start, a south southwest or southwest course, she could not have run beyond the middle of the river, in falling down a quarter of a mile, opposite to Rhinebeck dock. But the claimants' answer, by which their defence must be governed, avers that the collision took place near the west shore of the river, opposite Rhinebeck dock. This is palpably a gross error, for by no possibility could the Argus be so placed, having a view of the Bucktail at that distance, as to act on the belief that the latter was holding a southwest course, with a wind asserted to be nearly free for her from the time she came about to the moment of collision; and it would be physically impossible the two vessels could, under the circumstances, come in contact on a line nearly at a right angle from the point of departure of the Bucktail. If the Argus saw the Bucktail come about, a mile off, then the two vessels must have run an equal distance in the same time, and directed to the same point, in order to effect the meeting, and the Bucktail, instead of heading down the river, must have been necessarily and obviously to the eye, laying

at nearly right angles across it; which would have been emphatic notice to the Argus not to attempt to cross her bows.

If the distance of a mile and the position of the Argus on the west shore is disregarded, and the Bucktail is assumed to have been seen three-quarters, a half, or quarter of a mile distant, the Argus being in the middle of the river, the difficulty of reconciling the claimants' theories and diagrams with the proved facts, are no way diminished; on the contrary, they are multiplied and enhanced. The nearer the two vessels are placed to each other, at the moment the Bucktail came round on her larboard tack, the more difficult and improbable would be a collision in the manner this occurred; for the Argus continuing her course in the middle of the river, every moment she advanced in that direction, with a speed superior to that of the Bucktail, she would necessarily be running out, and passing the point where the Bucktail must cross her track, even at right angles, and the more oblique the course of the Bucktail on the wind, towards that line, the more improbable would be their meeting on that line. This improbability of contact upon these assumptions would become next to an impossibility, on the allegations of the answer. The Argus is by the answer placed near the west shore, opposite Rhinebeck dock, which, it is seen, is only a quarter of a mile below the position of the Bucktail, on the opposite side of the river; and if, instead of the two running in different directions, both had endeavored, on the most direct line, to reach collision, it would be utterly incredible that the Argus would not, before a strong and free wind, in her trim, have passed the point before the Bucktail, deeply laden, could beat the same and even a greater distance. It is, therefore, most clear, that if the proofs had been secundum allegata, and shown the Argus running her course before the wind, near to the western shore, when the Bucktail came about, there could be no rational mode of accounting for the collision on the proofs, but by supposing the Bucktail, after the Argus passed her track, bore up, and by superior speed, overtook and ran into the latter vessel.

The answer and proofs of the respondent do not so correspond that they can stand together and establish the case for him in either aspect, but yet the proofs may be used to countervail the evidence adduced on the part of the libellants, and take away their claim to a recovery. So, also, the claimants' proofs or answer may be invoked by the libellants, in support of their version of the transaction. The statement of Swart, the helmsman, and Warringer, the pilot of the Bucktail, is in substance, that she was beating down the river, westward on her larboard tack, and as close to the wind as she could lie, when it was found that the Argus had taken no measures to avoid her, and the two vessels were approaching each other rapidly, in a way threatening an immediate collision. That the Argus was hailed loudly to luff, and not obeying the order, the Bucktail bore up, and instantly was run into by the Argus, on her larboard bow; and that if any watch had been kept on the Argus, the danger would have been seen on board her in time, and she could easily have avoided it.

Testimony is given by the claimant tending to impeach the credit of Swart; and direct and strong evidence that a look-out was kept on the Argus, and that the Bucktail was distinctly seen, and her movements watched from the time she came about; and if she had held the course she took on that tack, and which her capacity as a sailer, and the direction of the wind enabled her to hold, she would have gone clear of the Argus, and that the collision was the consequence of her fault in these respects. If Swart's general character is impeached by the evidence, still the answer of the respondent in this behalf directly corroborates his statement, and that of Warringer, so that in respect to this branch of the issue, that testimony must prevail against any number of witnesses offered by the party who put in, and swore to the correctness of the answer. The allegations of the claimant are, that the night was very dark and hazy, that objects could be distinguished but a short distance; that when the Bucktail was first discovered, the Argus was kept away to the west shore, and "when the course of the Argus had been so altered," the Bucktail was made to deviate from her true and proper course, so as to run across the bows of the Argus, and make a collision between the two unavoidable. This places the two vessels precisely in coincidence with the description given by Swart and Warringer, and demonstrates that the Argus did not observe the Bucktail until the moment she attempted to avoid her by bearing away; and the presumption is exceedingly strong, that the attention of the Argus was first called to the Bucktail from the cry of the latter to luff, which was heard by her, and which was so urgent as to call up one of her men from below.

Whether, in that emergency, the most prudent and discreet course was pursued on board the Bucktail, in bearing away, also, it is not important to inquire and determine. She had a right to rely to the last moment upon the ability and care of the vessel before the wind, and if in the alarm, resulting from the instant danger, she adopted a false manoeuvre, that will in no sort excuse the Argus, or take away the right of the Bucktail to claim damages, since the confusion, and all the consequences of the then situation of the two vessels, arose from the fault of the Argus. The Diana, 1 W. Rob. Adm. 132; The Celt, 3 Hagg. Adm. 321; The Harriett, 1 W. Rob. Adm. 182. I am by no

means satisfied that any wrong manoeuvre was made by the Bucktail, or that she had it in her power to take any course, when it was found that the vessels were directly upon each other, which would have rescued her from the danger that was upon her.

The Argus had no right to pass the bows of the beating vessel, unless she had clearly room enough to do it without driving her into the wind, or to come so closely upon her stern as to alarm her for her safety, and induce her, under such apprehension, to bear away before the wind. There was the full breadth of the river to the Argus, with a free wind, and it was her duty to observe the Bucktail and take such a course as to leave her undisturbed on her tack.

It is clear to my mind, upon the evidence, that this was not done, and the unfeeling neglect on board the Argus after the disaster to stop and aid the crippled vessel or ascertain what might be her danger, although urgently appealed to with the cry that she was sinking, and from the refusal on the part of her officers to give the name of the vessel, is impressive evidence of conviction on board of the Argus that the wrong had been wholly on her side. Moreover, the character of the injury received, as detailed by the ship-carpenters, is very strongly corroborative of the statements of the libellants' witnesses, that the Argus struck the Bucktail stem on, and did not receive the blow obliquely from the Bucktail to the windward of her, and in the act of escaping the contact.

There is no conflict between the parties as to the law applicable to the case. The libellants do not deny that it was the duty of their vessel to hold her course down the river, as uniformly as the circumstances under which she was sailing, combining wind, the tide, the lading and trim of the vessel, and her capacity as a sailer would admit, certainly until coming near the Argus, and having great reason to fear the latter would not take measures to avoid her; and the claimant admits that she was entitled to run out her tack, and that it was the duty of the Argus, while such course was pursued, to take precautions, from her having a free wind, to avoid intercepting or injuring the Bucktail, so maintaining her direction. These views are elucidated, and the principles of law applicable to them are very fully discussed in the books. Story, Bailm. §§ 608, 609, 611; [Hawkins v. Dutchess & O. Steam-Boat Co.,] 2 Wend. 452; Rathbun v. Paine, 19 Wend. 399; 3 Kent, [Comm.] 184; The Celt, [Woodrop-Sims,] 2 Dod. 83; The Chester, [The Celt,] 3 Hagg. Adm. 321; [The Chester,] Id. 316; The Diana, 1 W. Rob. Adm. 131; The Harriett, Id. 182; 7 Lou. 222.

The proof of the established usage and custom in navigating the North river is in consonance with nautical usages at sea, and the rules of law laid down in the authorities above cited. In my judgment, the evidence in this case clearly casts the blame upon the Argus, and imposes upon her the duty of bearing the loss. There was manifestly a want of proper precaution on her part, or of skill and attention in managing her, in her approach upon the Bucktail, and however severe the consequences may be upon the absent owner, the law lays upon him and his vessel the responsibility of repairing the damage which she has occasioned.

I must, accordingly, pronounce for the libellants in this cause, and decree that they recover damages for the injuries they have sustained, which must be a compensation for the actual loss of property. The Dundee, 1 Hagg. Adm. 120.